## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SANDRA TAMARI,     )
           )
     Plaintiff,  )
           )
vs.           )  Case No. 3:16-CV-00063-NJR-DGW
           )
BOARD OF TRUSTEES OF SOUTHERN )
ILLINOIS UNIVERSITY,    )
           )
     Defendant.  )

# <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

  Plaintiff Sandra Tamari filed this employment discrimination and retaliation case pursuant to Title VII of the Civil Rights Act of 1964, alleging Southern Illinois University unlawfully discriminated against her on account of her national origin (*see* Amended Complaint at Doc. 23). She also alleged the University retaliated against her for filing an internal complaint and a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On June 1, 2017, Defendant Board of Trustees of Southern Illinois University ("the University" or "SIU") moved for summary judgment (*see* Docs. 49, 50) on Tamari's claims. After the motion was fully briefed the parties, the Court heard oral arguments at a hearing on October 17, 2017. For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

  Plaintiff Sandra Tamari began working at SIU in August 2007 as an International Admissions Specialist within the Department of International Student Services at SIU's

Edwardsville campus ("SIUE") (Doc. 50-1, p. 2, Doc. 50-3). Tamari is a United States citizen whose national origin is Palestinian (Doc. 59-3, p. 1; Doc. 23). English is Tamari's first language, but she is fluent in Arabic (*Id.*). During her employment with SIU, Tamari served as an advocate for students from the Middle East (Doc. 59-3, p. 1). According to Tamari, her advocacy for Middle Eastern students and those who speak Arabic subjected her to hostility from members of the Office of Admissions (*Id.*).

Shortly after joining the University, Tamari began attending the International Team meetings, which focused on international student recruitment (*Id.* at p. 2). She and her colleague, Geet Vanaik, represented the international office (*Id.*). Several members of the admissions office also attended the meetings (*Id.*). In 2010, Tamari and Vanaik went to Scott Belobrajdic, Associate Vice Chancellor of Enrollment Management (and head of the admissions office), and expressed concern about obstacles the admissions office was creating regarding recruitment and admission of international students (*Id.*). After this meeting, Belobrajdic became personally involved with the International Team, initiating an effort to develop a three-year plan to improve recruitment of international students (*Id.*). Tamari was "significantly involved" in all aspects of this strategic plan to recruit international students and was generally praised for her good work (*See id.*).

In 2011, Tamari served on a search committee to select a new Associate Director of Admissions (*Id.*). Tamari attests that she filed a complaint with the University after she witnessed the Director of Admissions, Todd Burrell, manipulating the search to get the candidate he desired—a white male—as opposed to the other finalist, an

African-American female (*Id.*). Soon after making the complaint, Burrell left Tamari out of the search committee discussions by leaving her off an email message (*Id.*).

In 2012, SIU hired a new Chancellor, Dr. Julie Furst-Bowe, who sought to increase the University's international recruitment efforts (Doc. 50-5, p. 4-5). In Spring 2013, several new positions were created to advance that goal, including an Assistant Director of Graduate and International Recruitment ("Spring 2013 Assistant Director position") (*Id.*, p. 6, Doc. 50-7). After hearing that Burrell, the Director of Admissions, may have "pre-selected" a candidate for the Assistant Director position, Tamari and Vanaik asked Belobrajdic about whether that was true. While he replied that anyone could apply for the position, he did not deny or refute the allegation that an individual had been pre-selected (Doc. 59-3, p. 3). After this meeting, Tamari's supervisor, Ron Schaefer, made the decision that the international office would no longer be participating in the International Team meetings and asked Tamari and Vanaik to remove the meetings from their agendas (*Id.*).

On March 4, 2013, Tamari applied for the Spring 2013 Assistant Director position (Doc. 50-8). A search committee, comprised of three Caucasian females, two Caucasian males, one Filipino male, and one Turkish male, was formed to first select telephone interviewees, then to narrow the candidates to a smaller group of finalists for on-campus interviews (Doc. 50-9). The search committee reviewed thirty two applications and selected ten candidates, including Tamari, for 15-minute telephone interviews (Docs. 50-10; 50-11).

Tamari's phone interview occurred on April 12, 2013. According to Tamari, the interview was abrupt and rushed (Doc. 59-3, p. 3). She was not asked if she had any questions for the committee, and she did not believe the committee was interested in exploring her qualifications for the position (*Id.*).

Tamari's interview was digitally recorded by the search committee secretary, Kay Weis, on a University-issued digital recording device (Doc. 50-12, p. 1). In addition to Tamari, six other candidates' interviews were recorded because one of the committee members could not attend the telephonic interviews that day (Doc. 50-1, p. 8; Doc. 50-12, p. 1). After the missing committee member listened to the interviews on the digital recorder, she returned the recorder to Weis. Weis then continued to use the device to record various meetings in the Enrollment Management Office, eventually recording over the April 12, 2013 interviews (Doc. 50-12, p. 2). Weis attested that it is impossible to know when the interview was recorded over due to the high frequency with which she used the recorder (*Id.*). She also verified that she did not record over Tamari's interview for any improper reason, but rather only to continue using the device (*Id.*).

After the phone interviews were complete, each member of the search committee named three finalists he or she believed should move on to the next round of interviews. No member of the search committee recommended Tamari for an on-campus interview (Doc. 50-13). Six of the seven committee members attested that they made this determination after Tamari's telephone interview performance and after considering the relative qualifications of the candidates (*Id.*). The seventh member attested that he decided not to vote for Tamari after observing that none of the other search committee

members voted for her and, in an effort to block another candidate he did not believe was a good fit for the position, decided to support an alternative candidate (Doc. 50-13, p. 7). All seven committee members verified that they did not consider Tamari's national origin at any time during the search process (Doc. 50-13).

Belobrajdic, as the hiring manager, ultimately decided to hire Melissa Mace, who had previously served as the Acting Director of International Services at another university (Docs. 50-18, 50-37). Tamari attended Mace's on-campus interview and recalls that Mace made a number of factual errors in her interview and exceeded her allotted presentation time by more than twenty minutes (Doc. 59-3, p. 4). Vanaik also attested that her review of the finalists' resumes revealed that Tamari was the most qualified individual for the position (Doc. 59-1, p. 2). According to Vanaik, nothing other than national origin discrimination could explain not hiring Tamari for the position (*Id.*).

Based on her concern that she had been subject to unlawful discrimination, Tamari went to SIU's Office of Institutional Compliance ("OIC") and filed a complaint of national origin discrimination (Doc. 23, ¶ 19). On June 18, 2013, Tamari met with the OIC's Assistant Chancellor and Assistant Director as part of the University's investigation of her complaint (Doc. 59-3, p. 4). During this meeting, the Assistant Chancellor, Paul Pitts, made statements that indicated he did not understand national origin discrimination. For example, he said discrimination must be overt to meet the standards of bias under the law (*Id.*). He then pointed to the skin on his forearm and said that overt discrimination is someone saying, "I won't hire you because you are black." (*Id.*). He also told Tamari she was not protected from discrimination because he

considered her to be white (*Id.*). Nevertheless, Pitts assured Tamari that all documents, evidence, and interview recordings had been preserved (*Id.*).

Tamari subsequently filed a Freedom of Information Act ("FOIA") request to get a copy of her phone interview recording, more than two months after her interview. The SIUE FOIA officer informed Tamari by email on July 1, 2013, that it would "take a while to get them copied." (*Id.*) A couple of weeks after receiving this message, Tamari received another email message notifying her that the interview recordings in fact were not saved (*Id.*).

After completing its investigation into Tamari's complaint, the University found insufficient evidence to support Tamari's allegations of national origin discrimination (Doc. 50-1, p. 16). On December 26, 2013, Tamari filed a Charge of Discrimination with the EEOC ("EEOC Charge") (Doc. 23, ¶ 4). Tamari and Vanaik subsequently were not permitted to speak directly with employees in the admissions office but rather had to go through their supervisor, Ron Schaefer (Doc. 59-3, p. 5). According to the University, this communication restriction applied equally to all members of the international and admissions teams (Doc. 50-5, p. 9, Doc. 50-37, pp. 1-2).

On March 14, 2014, an opening was posted for the Director of International Programs ("Spring 2014 Director position") (Doc. 50-19). Tamari applied for the position and was selected as one of four finalists after an initial Skype interview (Doc. 50-1, p. 28). Before any on-campus interviews were conducted, however, the search was canceled at the direction of the incoming Provost and Vice Chancellor for Academic Affairs (Doc. 50-21). On June 9, 2014, Tamari received an email message informing her of the

decision to cancel the search and explaining that the new Provost had "a new plan for campus internationalization" and "would like to be involved significant in the restructuring of campus efforts towards this goal." (*Id.*). The email message further stated that the search committee found Tamari's credentials impressive and would inform her of future opportunities (*Id.*).

Pursuant to the incoming Provost's restructuring of the Office of International Programs, SIU's "Office of International Affairs" was created (Doc. 50-22). On January 20, 2015, the position of Executive Director of International Affairs was posted (Doc. 50-23). The minimum qualifications for the job included a Master's degree from an accredited institution and "at least five years of administrative experience in a director position related to international education in higher education" (*Id.*). On February 17, 2015, Tamari applied for the Executive Director position (Doc. 50-24). On March 24, 2015, the Chair of the search committee sent an email message to committee members indicating the Provost asked that they make absolutely certain that each candidate have five years of experience explicitly with the title of "director" or "executive director." (Doc. 50-25). Based on this criterion, the Chair concluded that Tamari, as well as another male candidate with only three years of experience as a "director," did not meet the requirements of the position and should be removed from the committee's consideration (*Id.*). The committee Chair attested that he did not consider Tamari's national origin at any time, including when considering whether she met the minimum qualifications for the Executive Director position (Doc. 50-26).

On May 12, 2015, Tamari had dinner with Chancellor Furst-Bowe. In reference to the ongoing search for the Executive Director of International Affairs, the Chancellor told Tamari: "I am very sorry this happened to you. You are by far the most qualified." (Doc. 59-3, p. 6). According to Tamari, the Chancellor also told Tamari she would "make things right," that she knew Tamari had been performing the duties of the director of international programs, and that she would instruct the Provost to cancel the search and appoint Tamari to the Executive Director position (*Id.* at p. 7). In an affidavit, Chancellor Furst-Bowe stated that while she sympathized with Tamari's frustration over the hiring process, she never expressed to Tamari that she believed Tamari was discriminated against because of her national origin or retaliated against because of any complaints she made (Doc. 50-32).

After the search committee interviewed the finalists for the Executive Director position, the Provost determined that none of the candidates had the strengths needed to begin a new international office (Doc. 50-28). On June 22, 2015, in an email message to the search committee, the Provost announced the decision not to proceed with the search (*Id.*). He also announced that Mary Weishaar, a search committee member and Associate Dean of the School of Education, Health and Human Behavior, would be appointed Interim Director (*Id.*). According to Tamari, Weishaar's degrees are in education and special education and she has limited experience in international affairs (Doc. 59-3, p. 6). Furthermore, no explanation had been provided as to why Weishaar selected for the position without the required "director" experience (*Id.*). At a lunch on July 14, 2015, Chancellor Furst-Bowe told Tamari she was sorry the Provost did not listen to her and

that her administration had hidden Tamari's existence and job responsibilities from her (*Id.* at p. 7).

After Weishaar was appointed Interim Director, Tamari expressed concern with the Office of Equal Opportunity, Access, and Title IX Coordination ("EOA") that Belobrajdic, a member of the search committee, engaged in discrimination and retaliation against her and negatively impacted her opportunity advance in the search (Doc. 50-30). Belobrajdic denied any wrongdoing, noting he was not present when any discussion about Tamari took place. He also had recused himself from any review of Tamari to avoid any perceived conflict of interest considering Tamari had already filed her complaint of national origin discrimination with the University and with the EEOC (*Id.*; Doc. 30-5). Based on its review, the EOA determined there was insufficient evidence to support Tamari's concerns that discrimination and/or retaliation impacted her application (Doc. 50-30). Rather, the hiring decisions related to the 2015 Executive Director position—as well as the Spring 2014 Director position—were influenced by the Provost's strategic goals for the Office of International Affairs (*Id.*). Tamari appealed this decision to Chancellor Furst-Bowe, who upheld the EOA's decision while also recommending Tamari be appointed Assistant Director of International Affairs, a promotion she received in September 2015 (Doc. 50-31).

On November 6, 2015, Tamari received a Notice of Right to Sue letter from the EEOC and United States Department of Justice (Doc. 23, ¶ 4). Shortly thereafter, Tamari applied for the position of Director of Graduate and International Admission (Doc. 50-34). Tamari again was selected for an initial interview and as a finalist for the

position (Doc. 50-1, p. 36), but Belobrajdic, the hiring manager, ultimately selected another candidate, James Monahan, for the position (Doc. 50-36). In his hiring justification, Belobrajdic stated that if Monahan was not approved to move forward in the search or if he declined the University's offer, then Belobrajdic did not find any of the other three finalists to be acceptable for the director role (*Id.*).

Although Tamari was not selected for these positions, she did receive several promotions and raises in annual salary after she filed her OIC complaint and EEOC Charge (Doc. 50-1, p. 3). Tamari filed this lawsuit on January 20, 2016 (Doc. 1).

LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

**DISCUSSION**

## I.    National Origin Discrimination

Tamari's national origin discrimination claim is based solely on her allegation that she was not selected for an on-campus interview in 2013 for the position of Assistant Director of Graduate and International Recruitment. SIU argues it is entitled to judgment as a matter of law because Tamari has failed to show that a reasonable factfinder could conclude the reason she was not selected for the Spring 2013 Assistant Director position was because of her national origin.

Title VII prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The applicable standard at summary judgment "is simply whether the evidence would permit a reasonable factfinder to conclude" that the plaintiff's national origin caused the adverse employment action. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *Henderson v. Shulkin*, No. 17-1074, 2017 WL 6550598, at *4 (7th Cir. Dec. 22, 2017). Although the Seventh Circuit in *Ortiz* banished

consideration of "direct" versus "indirect" evidence, a plaintiff may still use the *McDonnell-Douglas* burden-shifting test to make the required showing. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017).

The *McDonnell Douglas* burden-shifting framework requires a plaintiff to carry "the initial burden of establishing a prima facie case of discrimination." *Id.* To establish a prima facie case of national origin discrimination based on the failure to promote, a plaintiff must set forth evidence that: (1) she is a member of a protected group; (2) she was qualified for the position she sought; (3) she was rejected for the position; and (4) the employee promoted to the position was not a member of the protected group and was not better qualified for the position. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1328 (2017); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its decision. *McKinney*, 866 F.3d at 807 (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer meets this requirement, the burden then shifts back to the plaintiff, who must produce evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000).

To demonstrate pretext, "a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation." *Johnson*, 260 F.3d at 732. A plaintiff can demonstrate pretext by showing: (1) the defendant's explanation for its decision had no basis in fact; (2) the explanation

was not the "real" reason; or (3) the reason stated was insufficient to warrant the allegedly discriminatory action. *Id.*

Under the standard clarified by the Seventh Circuit in *Ortiz* and subsequent cases, the ultimate question in this case is whether the evidence would permit a reasonable factfinder to conclude that Tamari's national origin caused her not to be selected for an on-campus interview for the Spring 2013 Assistant Director position. SIU argues that no such evidence exists, as Tamari has no proof that she was more qualified for the position than the candidate who was ultimately hired. Even if Tamari could assert a prima facie case of national origin discrimination, however, SIU asserts that her claim still fails because SIU has a legitimate, non-discriminatory reason for not selecting Tamari for an on-campus interview: the search committee simply did not find her to be worthy of a second interview when compared to the other candidates following her initial phone interview.

In response, Tamari argues that individuals who were significantly less qualified were selected for on-campus interviews, and the only reason offered for her rejection was that she performed poorly in her phone interview. When Tamari asked that the recording of her phone interview be preserved, she was told that it would be. But, after repeatedly being assured that the recording existed and would be preserved, SIU later told Tamari the recording was erased. Tamari argues that SIU has provided no reasonable explanation as to how or why the digital recording was lost, and a reasonable inference from the recording's disappearance is that it would destroy SIU's claim that she performed poorly in the interview. She argues that entering summary judgment for

Defendant at this stage and on these facts would reward either (1) a negligent failure to preserve evidence, or (2) willful destruction of essential evidence. The finder of fact may reach the conclusion that if the recordings had been preserved, the recordings would reveal an unlawful and discriminatory intent. Thus, summary judgment is unwarranted.

There is no dispute that Tamari is a member of a protected group, she was at least minimally qualified for the position she sought, and she was rejected for the position. The only apparent dispute is whether Tamari was more qualified for the position than the person who was ultimately hired. The Court disagrees with SIU that there is no such evidence in the record. Geet Vanaik, Tamari's colleague and the current Lead Immigration Coordinator at SIU's Edwardsville campus, attested that her review of the candidates revealed that Tamari was more qualified than any of the finalists who received on-campus interviews. SIU has not disputed this evidence with any evidence of its own. Thus, construing all reasonable inferences in favor of Tamari, the non-movant, the Court finds that Tamari has established a prima facie case of national origin discrimination.

The burden now shifts to SIU to provide a legitimate, non-discriminatory reason for not selecting Tamari for an on-campus interview. According to SIU, that reason is simply that the search committee thought Tamari performed poorly on her phone interview. Indeed, after completing the phone interviews, no member of the search committee recommended Tamari for an on-campus interview (Doc. 50-13). Six of the seven committee members verified that they made this determination after Tamari's telephone interview performance and after considering the relative qualifications of the

candidates, while the seventh decided to support another candidate as a strategic maneuver (*Id.*, Doc. 50-13, p. 7). Thus, SIU has provided a legitimate, non-discriminatory reason for not choosing Tamari to advance in the hiring process.

The burden now shifts back to Tamari to prove that SIU's reason for not selecting her is merely a pretext for intentional national origin discrimination. "Pretext means a dishonest explanation, a lie rather than an oddity or an error. Pretext is more than a mistake on the part of the employer; it is a phony excuse. Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). Courts have found evidence of pretext where the employer gives shifting or inconsistent explanations for the challenged employment decision, *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003), where there is evidence of behavior toward or comments directed at other employees in the protected group, *Burks v. Union Pac. R. Co.*, 793 F.3d 694, 700 (7th Cir. 2015), or when an employment decision is reached in an "unusual" way, *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010).

This is where Tamari's claim fails, as she has no evidence that the University's proffered reason was pretextual. She has no evidence the committee lied in explaining that her performance on the phone interview did not warrant an on-campus interview; thus, the committee members' affidavits stating that they never considered Tamari's national origin during the search process remain uncontroverted.

Presumably recognizing she has no evidence of pretext, Tamari instead focuses on the "missing" digital recording of her interview. She argues that SIU has provided no

reasonable explanation for its loss and has not revealed whether any efforts were taken to recover the digital recordings. Tamari avers that one reasonable inference from the missing evidence is that the recording would "destroy defendant['s] assertion that the plaintiff was not selected due to her performance in the phone interview." She asserts that the finder of fact may conclude that, if the recording had been preserved, it would reveal an unlawful and discriminatory intent. Tamari argues that whether to believe or reject the University's proffered explanation for the destruction of the evidence is not a credibility determination that can be made at summary judgment.

First, the Court notes that there *is* evidence in the record demonstrating a "reasonable explanation" for the loss of the digital recording. Kay Weis, the search committee's secretary, verified by affidavit that the April 12, 2013 interviews, including Tamari's, was recorded over when she continued to use the device to record meetings in the Enrollment Management Office (Doc. 50-12, p. 2). Weis further attested that it is impossible to know when the interview was recorded over due to the high frequency with which she used the recorder, and that she did not record over Tamari's interview for any improper reason (*Id.*). Tamari has provided no evidence to dispute Weis's affidavit.

Second, it is well established that "[a]n employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case." *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002); *Everett v. Cook Cty.*, 655 F.3d 723, 727 (7th Cir. 2011). "Rather, in order to draw an inference that the absent documents contained

negative information, [the plaintiff] must show that the documents were intentionally destroyed in bad faith." *Everett*, 655 F.3d at 727 (citing *Norman–Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010)). "A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (citation and quotations omitted). Whether a defendant acted in bad faith is a question of fact, allowing the trier of fact to draw any reasonable inference. *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). Thus, a court may infer bad faith from the circumstances of the destruction. *Id.*

Here, the only evidence Tamari relies on to demonstrate bad faith is the assurance by Assistant Chancellor that the recording would be preserved—only later to find out it was not. The testimony of Kay Weis reveals, however, that the interview was not deleted for the purpose of hiding any adverse information. Instead, she verified that she simply continued using the recording device, with frequency, and that all of the interviews that day were recorded over. Moreover, Tamari's speculation at oral argument that the recording would have captured any discriminatory comments by the committee before or after her interview is just that—speculation. Speculation is not enough to defeat summary judgment. *See Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"). Indeed, Tamari admitted she has no evidence that anyone on the committee was even aware of her national origin. No reasonable factfinder could infer, from this evidence, that the University destroyed the recording in bad faith.

The University has presented a legitimate, non-discriminatory reason for not

selecting Tamari for an on-campus interview—her performance in her phone interview—and Tamari has not presented any evidence that this given reason is a pretext for discrimination. While she claims the missing recording of her interview would have revealed the committee's discriminatory intent, she has no evidence the recording was intentionally destroyed in bad faith. Her argument that the recording might have contained some incriminating statements by committee members between interviews is mere speculation. For these reasons, the University is entitled to summary judgment on Tamari's national origin discrimination claim.

## II. Retaliation

Tamari also claims she was not awarded three additional positions for which she applied in retaliation for the complaint she made to the OIC in 2013 and her EEOC Charge. She does not allege the filing of this lawsuit in January 2016 was a protected activity that led to any adverse employment action.

In Title VII retaliation cases, a plaintiff has the burden of producing enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the employer took a materially adverse action against her; and (3) there was a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)). "In the retaliation context, determining whether an action is materially adverse means inquiring whether it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citing *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 68 (2006)).

The inquiry in retaliation cases is whether the record contains "sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [adverse employment action]." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2017). "Without direct evidence of causation, [the plaintiff] must rely on circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation. *Burton*, 851 F.3d at 697 (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013)). Where the defendant produces non-retaliatory reasons for its conduct, the plaintiff must show that the proffered reasons are pretextual. *Id.*

A.      **Spring 2014 Director Position**

With regard to the Spring 2014 Director position, the University argues there is no evidence that Tamari's 2013 complaints were the "but for" cause of her not getting the job. Tamari was selected as a finalist for the position but, before any finalists were interviewed, the incoming Provost chose to cancel the search so he could be more involved in the process of reorganizing the International Programs Office into the International Affairs Office. Furthermore, Tamari has admitted she has no proof that the Provost was even aware of her OIC complaint or EEOC Charge when he decided to cancel the search. And, even if Tamari were to rely on circumstantial evidence such as suspicious timing, her argument would still fail based because there was nothing suspicious about the timing when the search was canceled six months after she filed her complaint.

In response, Tamari makes no attempt to show that her complaints were the but-for cause of the Provost canceling the search. She also makes no attempt to argue that any circumstantial evidence supports an inference of retaliation. Instead, she asserts that the Court cannot look at each hiring decision individually, but rather must consider the "totality of the evidence" and whether it supports a showing of retaliation. As the University points out, however, the case Tamari relies on for this proposition involved a post-trial motion for judgment as a matter of law following a jury verdict, in which the court considered whether the totality of the evidence supported a verdict of intentional discrimination. *See Sheehan v. Dolen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999). The dispositive question on summary judgment, however, is whether a reasonable jury could find a but-for causal link between the protected activity and adverse action at issue. Tamari has all but conceded there is no such link with regard to the Spring 2014 Director position. Thus, SIU is entitled to summary judgment with regard to this claim.

### B.      Spring 2015 Executive Director Position

SIU next argues there is no evidence of retaliation with regard to the Spring 2015 Executive Director position. SIU contends Tamari simply did not have at least five years of administrative experience in a director position, as stated in the minimum qualifications for the position. She was not the only candidate eliminated for this reason, as another male candidate was also excluded from the search because he only had three years of experience as a director. The Chair of the search committee, Dr. Michael Shaw, provided an affidavit verifying this was the reason Tamari was not interviewed (Doc. 50-26). Shaw also attested that no one on the search committee considered any

complaints by Tamari in reaching this conclusion (*Id.*).

In response, Tamari refers the Court to an email message from Shaw to the search committee, which stated: "[T]he Provost has asked that we make absolutely certain that each candidate has had 5 years of experience explicitly with the title of 'director' or 'executive director.' This criterion is very clearly stated in the position description . . . so this is a reasonable request." (Doc. 50-25). Tamari argues this email message demonstrates a specific and unlawful intent to eliminate Tamari from consideration for the position because the job posting itself does not require an "explicit" title of director. Tamari claims this email message demonstrates that the University's proffered reason is merely pretext.

The Court does not find this email message to be the smoking gun that Tamari claims it is. The official job posting (Doc. 50-23) states, in relevant part: "The successful candidate will have . . . **at least five years of administrative experience in a director position related to international education in higher education**." (emphasis added). Because the job posting specifically notified applicants that the position required five years of experience in a "director position," it was not unreasonable, or "fishy" as Tamari argues, for the Provost to ask the committee to narrow the list of candidates to those who have the required experience. It certainly is not evidence of retaliation, as Tamari does not dispute she has never held the title of director. While Tamari asserts it is "irrational" that SIU would exclude an applicant who is otherwise qualified for the position just because they have not held an explicit job title, the Seventh Circuit has frequently remarked that the court is "not a super-personnel board charged with

evaluating the general quality of employment decisions." *Brewer v. Bd. of Trustees of Univ. of IL*, 479 F.3d 908, 922 (7th Cir. 2007).

It is true that, after the search committee interviewed the finalists for the Executive Director position, the Provost determined none of the candidates had the strengths needed to begin a new international office (Doc. 50-28). As a result, the Provost discontinued the search and named Mary Weishaar, a search committee member and Associate Dean, as Interim Director (*Id.*). Weishaar, whose degrees are in education and special education, had no director-level experience when she was appointed. Tamari points to this fact as further demonstrating the pretextual nature of the "director" requirement.[1] As the University points out, however, Weishaar was appointed well after Tamari was removed from the search and initially on an interim basis after the Provost was unsatisfied with any of the finalists. And while there is some evidence that Chancellor Furst-Bowe told Tamari—after she was disqualified from the search due to her lack of experience as a director—that she was "by far the most qualified," the Chancellor also attested that she never expressed any belief that Tamari was being retaliated against because of her complaints. Evidence that Weishaar was appointed after the failed search and that the Chancellor sympathized with Tamari's frustration over the hiring process is insufficient to permit a reasonable factfinder to conclude that Tamari was disqualified from the position in retaliation for her 2013 OIC complaint and EEOC Charge. Accordingly, SIU is entitled to summary judgment on this claim.

---

[1] Tamari also cites to Weishaar's deposition testimony several times (without reference to any page numbers), but did not actually include the deposition transcript as an exhibit to her summary judgment response. SIU did include Weishaar's deposition as an exhibit, but only the pages relevant to its argument. The portions cited by Tamari were not attached as summary judgment evidence.

### C. Winter 2016 Director of Graduate and International Admission Position

SIU next asserts that Tamari cannot support a retaliation claim with regard to the Winter 2016 Director of Graduate and International Admission position. SIU argues Tamari simply was not the most qualified candidate in the opinion of the hiring manager, Scott Belobrajdic, and Tamari has not put forth any evidence to meet the high burden that "but for" her complaints, she would have been selected for the position. SIU further asserts Tamari cannot show that the person selected for the job was not qualified for the position or that Tamari was better qualified. Lastly, SIU notes that Belobrajdic testified he never considered Tamari's complaints when he made his hiring decision.

Tamari's response notes that her EEOC Charge was against Belobrajdic[2] and that he rejected her for the Winter 2016 Director position within thirty days of her filing this lawsuit. She claims that filing her complaint in federal court is a "further protected activity and a continuation of the filing of the EEOC charge." Tamari also asserts that Belobrajdic's "hiring justification" memorandum states that if the candidate selected declined the University's offer, Belobrajdic did not find any of the other three finalists (including Tamari) to be acceptable for the Director role. Tamari avers this further supports a reasonable inference of retaliation.

The Court does not find Tamari's arguments persuasive. She did not plead retaliation for filing the complaint in this matter, despite filing an amended complaint well after she was rejected for the Winter 2016 Director position. Because Tamari did not plead this claim, the Court will not consider it. *See Colbert v. City of Chicago*, 851 F.3d 649,

---

[2] The EEOC Charge was never filed with the complaint or as an exhibit, so the Court is unaware of what exactly was contained in the charge.

657 (7th Cir. 2017), *cert. denied sub nom. Colbert v. City of Chicago, Ill.*, No. 17-595, 2018 WL 311364 (U.S. Jan. 8, 2018) (plaintiff who did not adequately plead his claims could not introduce them in response to defendants' motion for summary judgment).

Furthermore, the Court fails to see how Belobrajdic's hiring justification memorandum could cause a reasonable factfinder to conclude that the decision not to hire Tamari was motivated by retaliation. In fact, Belobrajdic's hiring justification discusses the selected candidate's numerous qualifications for the job. While Belobrajdic found Tamari and two others "unacceptable" for the position, he also testified he did not consider Tamari's complaints in making his hiring decision. Because Tamari has not come forth with any evidence suggesting that the hiring justification was pretext for a retaliatory motive, summary judgment is warranted on this claim.

### D. Other Retaliatory Acts

Finally, Tamari claims that after she reported the alleged national origin discrimination, she was excluded from campus-wide activities, prohibited from communicating with individuals in the admissions office, and subjected to treatment that made it more difficult for her to perform her normal job duties (Doc. 23, ¶ 26). At her deposition, Tamari testified that after filing her complaint, she was disinvited from the International Team meetings (Doc. 50-1, p. 22). She further testified she has been retaliated against by not being allowed to thrive in her career or be part of a management team, and that the former Vice Chancellor for Student Affairs, Dr. Narbeth Emmanuel, said she was "marked." In her response to summary judgment, however, Tamari only mentions the prohibition against speaking directly with members of the admissions

office. Thus, her claims regarding these other alleged adverse employment actions have been waived. *See Burton*, 851 F.3d at 695 (a plaintiff has "the burden of identifying protected activities and materially adverse actions in opposition to summary judgment before the district court" and the failure to do so waives those arguments).

The University first argues that the decision to prohibit communication between the two teams does not constitute an adverse employment action that would support a claim of retaliation, as it is, at most, a "commonplace management decision" and an example of a "petty slight[] or minor annoyance[] that often take[s] place at work and that all employees experience." *See Burton*, 851 F.3d at 696. Specifically, the University argues that the communication directive applied not just to Tamari but to all members of the international staff and admissions staff. Both Belobrajdic and Todd Burrell, the Director of Admissions, testified in their depositions that everyone in admissions and in international affairs was directed by Dr. Emmanuel to communicate with each other only through their supervisors (Doc. 50-5, p. 9, Doc. 50-37, pp. 1-2). Tamari also testified that she was told by Dr. Emmanuel that he "believed our two teams, meaning International Programs and Admissions, should get out of the sandbox until we could all calm down." (Doc. 50-1, p. 23). Tamari took that statement to mean that Dr. Emmanuel thought there was unprofessional communication going on between the two groups (*Id*.). Thus, according to the University, this was a management decision meant to reduce the tension between these employees.

Second, the University argues that Tamari has not shown a causal connection between the restriction on communication and her complaints of discrimination. Tamari

has presented no evidence that the decision was not made for appropriate and legitimate, non-retaliatory reasons.

Tamari's only response to this argument is to claim there is a genuine issue of material fact with regard to the University's claim that the communication directive applied equally to all members of the international and admissions teams. Tamari cites the affidavit provided by Vanaik, wherein she attests:

> This prohibition on speaking with admission staff interfered with my ability and Sandra's ability to perform our job duties, labelled us pariah and removed us from the admissions team. I know as an absolute fact that a similar prohibition was not placed on admissions staff. I have read Belobrajdic's deposition and I have read his Affidavit in this matter; I have seen that he claims that admissions staff were subject to the same communication restrictions as was imposed on Sandra Tamari and me; this testimony/assertion is not truthful.

(Doc. 59-1, p. 5). Tamari does not refute the University's argument that the communication directive was not an adverse employment action.

In *Burton*, the Seventh Circuit stated that "not everything that makes an employee unhappy is an actionable adverse action." *Burton*, 851 F.3d at 696. Rather, "an adverse action is one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011). "An employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016) (citation omitted).

In this case, the Court agrees with the University that Tamari has not shown an adverse employment action. Even ignoring SIU's evidence and assuming the communication restriction applied only to Tamari and Vanaik, the only evidence in the

record demonstrating any effect this restriction had is the affidavit of Vanaik, in which she states that the prohibition interfered with their ability to perform their job duties, labelled them pariahs, and removed them from the admissions team. But none of these alleged consequences are anything more than a mere inconvenience or a temporary alteration of Tamari's responsibilities. Tamari was not technically part of the admissions team, and she could still communicate with admissions through her supervisor.

The Court finds the restriction to be nothing more than a "commonplace management decision" meant to calm the tension that had arisen between the two offices. Did that tension arise out of Tamari's complaint? Maybe. The record doesn't reveal why the two offices were engaging in unprofessional communication. But the fact that the University wanted to ease those tensions, especially after an employee has alleged discrimination, does not make the decision retaliatory. Because no reasonable employee would be dissuaded by the communication restriction from engaging in protected activity, Tamari's retaliation claim must fail.

## Conclusion

Plaintiff Sandra Tamari has failed to present sufficient evidence to permit a reasonable factfinder to conclude that she was not selected for an on-campus interview for the Spring 2013 Assistant Director position because of her national origin. Furthermore, she has failed to demonstrate that her complaint with the Office of Institutional Compliance or her EEOC Charge of Discrimination caused the University to take a materially adverse action against her. For these reasons, the Court **GRANTS** the Motion for Summary Judgment (Doc. 49) filed by Defendant Board of Trustees of

Southern Illinois University. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED:   February 5, 2018**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**